## Robert Hinds *v.* Frank E. Morgan et al.

1. Homestead Exemption.  *Code of* 1892, § 1983.  *Wife's failure to join in deed. Declarations of husband.*

Under code 1892, § 1983, a conveyance or incumbrance by the husband of the homestead, without the wife joining in the deed, is not valid. Rights to a homestead are not dependent upon mistaken or false statements made by the husband at the time of the execution of the deed, the wife practicing no fraud, but upon the fact of his being the head of a family and residing upon the premises as a home.

2. Same.  *Homestead declaration.*  *Code* 1892, § 1972.

The provisions of code 1892, § 1972, authorizing the filing of a homestead declaration, are prospective, and can have no application in case of debts contracted before the code became operative.

3. Same.  *Tract in part owned, in part leased.*

If a homesteader live on a forty acre tract of land leased by him, adjoining that to which he has title, and his farm be in part on both tracts, he may claim an exemption; but his homestead must be laid off just as if he also owned in fee the tract on which he has his residence. *Wiseman* v. *Parker*, 73 Miss., 378, distinguished.

From the chancery court of Washington county.

Hon. A. H. Longino, Chancellor.

Appellant, Robert Hinds, in 1891 was a married man, the head of a family and the owner of a tract of land containing two hundred and forty acres. His father, Thomas Hinds, owned four hundred acres of land contiguous to a portion of the son's tract. Robert, having leased the same, had his residence and lived with his family upon a forty acre tract of his father's land, which adjoins his own, and he cultivated and controlled the lands of both as one farm. Robert and Thomas, in the early part of said year, applied to Jayne & Watson, the agents of Wiley Morgan, for a loan of money, proposing to

jointly secure the same by a deed of trust on the lands of both. The loan was agreed upon, and when the deed of trust was being executed, Robert was asked by the agents of the lender if he lived upon or claimed a homestead in his lands, and he was informed that if he did either, his wife would, under the statute, have to join him in the execution of the deed. He stated in response that he did not live upon the land, and did not claim a homestead in it. The deed of trust was then executed by Robert and Thomas, the wife of the former not joining therein, and it was given upon the lands of both father and son. A mistake was made in the description of eighty acres of the land belonging to Robert, as it was written in the deed of trust. The debt having matured, and being unpaid, Robert and Thomas, in 1892, joined in a quitclaim deed, conveying, by its terms, all of said lands, by same description written in the deed of trust, to Morgan, the beneficiary of the deed of trust, and, about the same time, the deed of trust was foreclosed and Morgan purchased. A few months afterwards Morgan sold the lands, by same description written in the deed of trust, upon credit, and Robert rented it from Morgan's vendee during the years 1893 and 1894. Morgan's vendee having failed to pay him for the lands, his vendor's lien was enforced and the lands were, by same description written in the deed of trust, sold at public sale, in December, 1894, by a commissioner of the chancery court, and were purchased by appellees; Robert being present at said sale and making no objection thereto, and the sale was confirmed by the court. In January, 1895, Robert being in possession of the lands, not having terminated his tenancy under the vendee of Morgan, the mistake in the description in the deed of trust and other deeds was discovered, and Robert's attention being called thereto, he made to appellees a quitclaim deed to the eighty acres which was by mistake omitted from the deed of trust and subsequent deeds. At the time this last quitclaim was made, Robert was negotiating with appellees for a lease of the whole of the lands. These negotiations failed, and thereupon

Robert removed from the lands formerly belonging to his father, and planted himself and family upon that to which he had title originally, and claimed a homestead therein.  His wife had not joined in any of the deeds executed by him, and he filed and caused to be recorded, in February 1895, a homestead declaration, under § 1972, code 1892, designating one hundred and sixty acres of said land as his selection.  The bill in this case was filed by appellees to cancel Robert's claim as a cloud upon their title, and to remove him from the premises.  The decree of the court below was in their favor, and Robert appealed to the supreme court.

*Yerger & Percy*, for appellant.

The question involved in this suit is the right of appellant to the homestead claimed by him.

The policy to be pursued in construing homestead claims was announced at an early date by our supreme court in unmistakable terms.  As said in *Mosely* v. *Anderson*, 40 Miss., p. 49: "This exemption is granted without reference to the merit or demerit of the debtor.  It is founded upon a policy that has no reference to the character or conduct of parties claiming the benefit of it.  It is to the interest of the state that no citizen should be stripped of the implements necessary to enable him to carry on his usual employment, and that families should not be made paupers or beggars, or be deprived of shelter and reasonable comforts in consequence of the follies, the vices, or the crimes of their head.  The right to enjoy the benefits of the exemption does not in any manner depend upon the question whether the party is solvent or insolvent, whether he possesses other property or not, or whether he has or has not made a fraudulent disposition of other property with intent to hinder and delay his creditors."  And again, in *Campbell* v. *Adair*, in 45 Miss., p. 170, the court, speaking through Tarbell, J., says: "Homestead exemption is founded in a sound public policy, combining in its support a variety of substantial reasons.

. . . The statute intended the sustenance of a poor family. This policy has been characterized as benevolent, liberal, wise, and beneficent and humane. The homestead has been declared a place where the family may live in society beyond the reach of financial misfortune and the demand of the debtors. These exemptions are especially designed to guard the wife and children against neglect, misfortune, and improvidence."

The late Senator Benton, justly eulogized as one of the ablest and most sagacious of the many earnest American statesmen, advocating, in the United States senate, the adoption of a general homestead policy, said: "Tenantry is unfavorable to freedom. It lays the foundation for separate orders in society, annihilates the love of country, and weakens the spirit of independence. The tenant has, in fact, no country, no hearth, no domestic altar, no household god. The freeholder, on the contrary, is a natural supporter of a free government, and it should be the policy of republics to multiply their freeholds, as it is the policy of monarchies to multiply tenants. We may observe that there is unquestionably no greater incentive to virtue, industry and love of country than a permanent home, around which gather the affections of the family, and to which the members fondly turn, however widely they may become dispersed." *Johnson* v. *Richardson,* 33 Miss., 462; *McGrath* v. *Sinclair,* 55 Miss., 89; *Leslie* v. *Phipps,* 49 Miss., 790; 50 Miss., 34; 40 Miss., 49; *Baldwin* v. *Tilery,* 62 Miss., 378; *Colbert* v. *Handly,* 64 Miss., 374; *Asker* v. *Trueland,* 56 Miss., 30; *Parisot* v. *Tucker,* 65 Miss., 439; *King* v. *Sturgis,* 56 Miss., 606; *Wiseman* v. *Parker,* 73 Miss., 378; *Ross* v. *Porter,* 72 Miss., 361.

What essential ingredient was there lacking at the date of the execution of the trust deed by Robert Hinds and his father, to entitle the former to claim 160 acres of the land conveyed by them as exempt? His wife did not join in the conveyance. He was residing with her upon the land, in a house, it is true, situated upon the land of his father, but he was also in actual

possession and occupation of his own land, which adjoined it. He was occupying, as a home, every foot of the land which they sought to convey. He had a right to claim the exemption in any 160 acres of that land that he saw fit, provided the value of same did not exceed $2,000. He had the right to claim such exemption entirely in the land rented by him from his father, or, conversely, he had an equal right to claim such exemption in the land which he owned himself, or partly in one and partly in the other. If there had been no claim whatever made by him, and it had become necessary to allot to him a homestead out of the land conveyed, we know of no principle of law which would have required the commissioners making such an allotment to select the homestead in the land which he merely worked as a tenant. On the contrary, every reason which has shaped the policy of our statute would have directed them to make such an allotment in that manner which would have afforded a permanent home and shelter to the exemptionist and his family—namely, to the land in which he had a fee simple title.

It seems to us that there is only one possible doubt arising as to the validity of his claim to 160 acres in his own land. Under the language of the statute, it is possible that the exemptionist would have to include in his claim the house in which he resided. We submit to the court, however, that this direction of the statute is not mandatory, except where no selection of a homestead has been made, and it becomes necessary for the homestead to be allotted. The provision is manifestly intended to be entirely for the benefit of the exemptionist. He is given the house in which he lived because it is supposed that he wishes it. But where the property consists of a plantation upon which there may be a number of houses, all equally suitable for residence purposes, there is no reason why the exemptionist should not be allowed to select his 160 acres in a solid body, selecting, instead of the house in which he had lived, a house located upon the piece which he desires to claim. This con-

struction would conform to the reason and policy of the statute, and would avoid the necessity for the debtor selecting disconnected tracts, where the property surrounding the homestead was of little value, and this the court says he has the right to do. *Wisemen* v. *Parker, supra.*

Counsel for appellee strenuously contend that appellant could assert no homestead claim in his property, for the reason he was estopped to do so by his acts and declarations. Irrespective of any other authority upon this subject, it seems to us perfectly manifest that our court would not recognize the doctrine of estoppel as applicable to the question of the homestead. To so hold would be, in effect, to often deprive the wife and family of a home by the vices, follies or fraudulent conduct of the head of the family. It would be to hold that the right was a personal privilege which he could assert, or the assertion of which he could waive. It would be to hold that an invalid conveyance of a homestead could be validated by a false declaration of the head of the family that he asserted no homestead claim to the property. It would be to directly contravene the principle laid down in, *Leslie* v. *Phipps, supra,* that the "title to exemption is dependent on the facts of the debtor being the head of the family, and residing upon the premises as a home. Whenever his title is brought into controversy, the evidences that establish it are the proof of those facts."

*J. H. Wynn,* for appellee.

In *Rutherford* v. *Jamison,* 65 Miss., 221, it is said: "Homestead rights are to be protected according to law, but are not to be converted into instruments of fraud." In *Hill* v. *Franklin,* 54 Miss., 632, it is said: "Homestead exemption is a privilege rather than an estate." Another well-established principle in this state is that the wife has no interest in the homestead under our statute. *Billingsley* v. *Niblet,* 56 Miss., 540; *Smith* v. *Scherck,* 60 Miss., 495; *Pounds* v. *Clark,* 70 Miss., 264.

The trust deed was executed prior to the code of 1892, and must be governed by the law as it existed at that time, both as to the method of ascertainment and as to the amount. *Johnson* v. *Fletcher*, 54 Miss., 629. The homestead must embrace the mansion house. The appellant does not deny that the occupancy must be actual, but he undertakes to say that the actual residence required by the law was satisfied by his residence on his father's adjoining land. This contention is without merit. The appellant's case does not come within *King* v. *Sturgess*, 56 Miss., 60, because his exemption, if he had any, was on his father's land to the extent of his term therein, and that alone exceeded $2,000 in value, and he could not add any of his own land to this exemption without exceeding the limit. And, moreover, the appellant, by his pretense, says that he did not have a claim in his father's land, for he claims that the full 160 acres lies in his own tract. Then, claiming the 160 acres in his own land, where was the actual occupation thereof? The exemption must embrace the mansion house.

The appellant says that, while he was actually living upon his father's land, he was "intending and preparing" to remove upon his own land. Even if he were in active preparation, at the time the trust deed was executed, of building a residence on his own land, the proof shows no such preparation as will be sufficient to create an intention even against an execution at law. Where no one is injured or has parted with value upon the faith of the fact that the land was unoccupied, the case might be different, but, as in this case, where money was loaned upon the fact that he was residing upon his father's land, and not upon his own land, and where he expressly stated, in order to get the money, that he had no homestead claim in the land, and said nothing about preparing to occupy the land as a homestead, his claim will not be entertained for a moment; for it is an effort upon his part to pervert the homestead law into an instrument of fraud.

If a claimant had 160 acres of land worth less than the statutory limit, and actually lived upon it, then the lender knows

that it is a homestead, and he lends at his risk.　But where a claimant owns 160 acres of land on which he does not reside, has a residence upon other land, separate and apart from the 160 acre tract, how can a lender know that the 160 acre tract is a homestead?　If the claimant, at the time he borrowed the money, tells him that it is his homestead, and that he was only temporarily absent from it, and that he is preparing to return to it, then the lender might be put on notice.　But where, as in this case, the appellant not only had not told that he claimed a homestead in his own land, but expressly told that he did not claim a homestead therein, how, in the name of common justice, could they have known that he had a homestead claim in this land?　The appellant so used and treated the land, and acted in such a manner, as to lead to the belief that he had no homestead therein.

In *Rhine* v. *Ginevre*, 67 Miss., 142, the court say with reference to land claimed as exempt, '' Lot 148 had been so treated as to justify the conclusion that it was not a part of the homestead, but distinct from it,'' and the court held it not exempt. And in *Semmes* v. *Wheatley*, 7 So. Rep., 430, the court, reiterating the principle laid down in *Rhine* v. *Ginevre*, declared the rule to be salutary, and held the land was not exempt, because it had been so treated as to lead to the conclusion that it was not a part of the homestead.　Thompson on Homestead, secs. 241, 247.

The appellant says that estoppel cannot be pleaded, because his wife had an interest in the homestead, and that he could not do indirectly what he could not do directly, in reply to which I cite *Mone* v. *Ricketts*, 62 Miss., and *Shivers* v. *Simmons*, 54 Miss., 520, where a married woman was estopped by doing indirectly what she could not do directly.　In this state, where the wife has no interest, and the husband's legal title alone is involved, I say, the husband can estop himself by his conduct. *Rhine* v. *Genevre*, *Semmes* v. *Wheatley*, above cited, and *Wilson* v. *Gray*, 59 Miss., 525, are instances of estoppel.　It may be

under *Kelley* v. *Wagner*, 61 Miss., 299, that the appellant could not divest himself of his legal title except by actual fraud, but Jayne and Watson both testify that, at the time of the execution of the deed of trust, that they explained to the appellant to convey the homestead, if he had any, in his own land, his wife would have to join in the conveyance. If this be true, and there is no reason to doubt it, a clearer case of actual fraud could not be made out. To sustain the appellant's defense would reverse the rule laid down in *Rutherford* v. *Jamison*, *supra*, and would make homestead rights instruments of fraud rather than a protection to claimants.

WOODS, C. J., delivered the opinion of the court.

The evolution of the law of homestead exemptions in this state presents a most striking and interesting study to the legal mind. By legislative enactment and judicial interpretation alike, the growth has been steady along lines most liberal in favor of those for whose protection and benefit homestead exemptions have been declared. It is, and from an early day in the history of our jurisprudence has been, the public policy of this state to preserve the homes of families, and, moreover, to insure to the heads of families, residing in their homes, the means of procuring a subsistence for the dependent members of the family. Our policy has been to prevent the making homeless and shelterless those whom the extravagance, misfortune, folly or misconduct of the head of the family has exposed to the righteous or rapacious demands of creditors, and, while so preventing, to secure, at the same time, the opportunity of acquiring a livelihood for the family. This public policy of ours is founded in the deepest political wisdom. It has for its immediate object the unassailable preservation of the home for the helpless family, with the present secured means of winning its daily bread; but the root of the matter strikes deeper, and underneath it lie considerations upon which the public safety may be fairly said to rest in large part. In republican govern-

ments, the matter important in the highest degree is that of inspiring and keeping alive in vigorous fashion the sense of independence in the individual man. This sense of personal independence. is mightily fostered by a fixed legal assurance of a home, with some of its comforts and all its necessaries, despite the chances and changes of time, a home with the means of maintaining it and beyond the power of strangers to touch with despoiling hand, and impossible of destruction save by the voluntary and deliberate act of the representatives of those for whose protection and welfare it was created.

We have said that the history of the evolution of our present exemption laws is characterized by ever increasing liberality. By the act of June 22, 1822, the farmer could hold as exempt the agricultural implements necessary for one male laborer, the wearing apparel of himself and his family, one bed and bedding, one plowhorse, and one cow and calf. By constantly widening views of public policy, we have come now to allow to the exemptionist property far in excess of that owned by a majority of the citizens of the state—horses, colts, wagons, buggies, sewing machines, furniture not exceeding in value two hundred dollars, supplies of food, products for man and beast adequate to supply the wants of the ordinary family, and many, many. other articles for whose enumeration time fails us. The like progressive spirit in declaring exemptions in real estate is observable at a glance. Formerly, eighty acres was the quantity and fifteen hundred dollars the value; now, one hundred and sixty acres, with value not exceeding three thousand dollars, if the exemptionist avails himself of his right to file his homestead declaration. When we turn to the judicial interpretation of the exemption statutes, we find the like increasing spirit of liberality in favor of the exemptionist.

In *Matthews* v. *Redwine*, 3 Cushman, in construing the statute allowing to each head of a family one plowhorse, it was held that where it appeared that the debtor owned only one horse, and that the horse was adapted to the business of plow-

ing, the exemption existed, although there was no evidence to show that the animal was used as a plowhorse.

In *Trotter* v. *Dobbs*, 38 Miss., 198, it was declared that, where the judgment debtor becomes a householder and head of a family, after the rendition of the judgment against him, but before sale under the judgment, he was entitled to hold as exempt the quarter section of land claimed by him as a homestead.

In *Mosely* v. *Anderson*, 40 Miss., 49, it was said that our exemption laws were founded in public policy, without reference to the conduct or character of the person claiming the exemption, and without reference to his merit or demerit, and, in that case, the statute allowing the debtor one slave to be selected by him, he must be allowed the slave selected, notwithstanding the fact that he owned other slaves which he had placed beyond the reach of his creditors, or notwithstanding the fact that he may have disposed of them to defeat his creditors.

In *Patrick* v. *Rembert*, 55 Miss., 87, it is said, consenting to a judgment does not waive homestead exemption and involve consent to sell anything and everything that the defendant has.

In *McGrath* v. *Sinclair*, 55 Miss., 89, it was said that the right to the exemption was not dependent on the nature of the estate, but that any interest in or tenure of land will entitle the debtor to assert his claim to exemption in the land occupied as a residence, if the claimant be not a trespasser or wrongful intruder. To the same effect is *King* v. *Sturges*, 56 Miss., 606.

In this latter case, *King* v. *Sturges*, it was held that the debtor, who owned 40 acres, on which he did not reside, but which adjoined another 40-acre tract which the debtor occupied as tenant at will of a railroad company, was entitled to assert his homestead exemption to the entire tract of 80 acres, though he did not actually reside upon the 40 acres owned by him in fee—the principle being that he might claim an exemption in either 40 acres, or both, if they did not exceed the statutory limit, and though held by different tenures.

In *Asker* v. *Trueland*, 56 Miss., 30, and *Parisot* v. *Tucker*,

65 Miss., 439, a claim to exemption was sustained, though one of the parcels of land in the one case was separated from the other grounds, on which the residence stood, by a street, and in the other, the lands claimed as exempt were separated from each other by the depot grounds and right of way of a railroad company.

Many other adjudications might be cited, but the principles to be gathered from the above will render of easy solution the question involved in the case before us.

As to the declarations alleged in the bill and shown in the depositions of Mr. Jayne and Mr. Watson to have been made by the appellant, to the effect that he had no homestead in his lands, it is to be said that his rights are dependent not upon any mistaken, or even false, statement of his, made at the time of borrowing the money, but upon "the facts of appellant being the head of a family and residing upon the premises as a home." If the statements of the husband, of the character shown here, can defeat the homestead claim, then, in every case, what could not be done directly might be done by indirection, and the beneficent public policy of our law be utterly frustrated, and innocent families be turned out upon the world, homeless and paupers. There is no hint that the wife practiced any fraud, or attempted so to do.

That the lands of appellant and his father constituted one plantation, under one fence, all controlled or cultivated by appellant as one place, and that appellant and his family resided on a 40-acre lot belonging to the father and adjoining 120 acres of appellant, is not denied. These facts entitled him, at the date of the making of the loan, and the date of the sale of the premises under the trust deed, to a homestead exemption in the 40-acre lot belonging to Thomas Hinds, and upon which appellant then resided with his family, and in the other lands either leased or owned by him, or in both. The trouble arises in making, at this late day, the proper selection, for a selection must now be made under the direction of the court below. The

homestead declaration filed by appellant cannot be maintained, because his rights are to be measured by the law in force when his contract for the loan was made; but, though mistaken as to the measure of his rights and the mode of their enforcement, he is not to be denied that which he was entitled to in 1891, when the loan was effected.

If thought to be necessary, the pleadings should be so amended, after the case has been remanded, as to invoke the power of the court to have the homestead allotted by commissioners, under such directions as will subserve the policy of our laws in preserving a home to the exemptionist and his family, and in securing him the means of acquiring a livelihood out of the exempt lands. The rights of the appellees should not be arbitrarily disregarded in making the allotment, but, including the forty acres leased from his father, and on which he resided in 1891, or any part of this forty acres, less than the whole, containing the residence and outhouses, and contiguous to the lands owned by appellant, if such subdivision of the forty acres can be fairly and reasonably made, and without sacrificing the rights of appellee, by making an allotment which would seriously impair the value of that portion of the forty acre tract not included in the allotment, there should, it appears to us, be set apart of the appellant's own lands, adjoining the residence forty-acre tract of the father, enough to meet the requirements of our statute as it stood at that time.

See *Wiseman* v. *Parker*, 73 Miss., 378, as to the general course to be observed in making the allotment. Of course, what is said in that opinion as to the proper construction of the provisions of code of 1892, which, for the first time, are found in our laws—as, for example, that only the dwelling house need necessarily be included in the allotment, and that the lands allotted need not necessarily be contiguous—are inapplicable in the present case. Under the law as it stood in 1891, the lands allotted must be contiguous, and the outhouses, as well as the dwelling house, must be on the lands allotted. To allot to him

all of his homestead exemption in the leased lands of his father would be, practically, to deny him and his family any of the benefits designed to be conferred by our exemption laws.

*Reversed and remanded, to be proceeded with in the court below in accordance with this opinion.*