ADAMS, et ux. *v.* BOUNDS, SHERIFF.

No. 39683 June 13, 1955 81 So. 2d 235

*Lamar F. Easterling, Colbert Dudley,* Jackson, for appellants.

*O. B. Triplett, Jr.,* Forest, for appellee.

McGehee, C. J.

The appellants W. B. Adams and wife, Vadie Moore Adams, filed their bill of complaint on June 4, 1954, and obtained a temporary injunction to restrain a sale under execution of a two-acre parcel of land in the town of Raleigh, in Smith County, on which there is located a six room residence which was occupied by them and their four children as a homestead prior to the year 1951, when they moved to Jackson where they first rented a number of residences in succession until July 8, 1952, when they purchased Lot 13, Block B of the Belvedere Subdivision in the City of Jackson, on which there was located a residence, at a purchase price of $1,250 in cash and the assumption of an indebtedness of nearly $10,000 thereon.

At the time of the filing of this suit the residential property at Raleigh was being advertised to be sold on June 7, 1954, by the appellee A. E. Bounds, Sheriff of Smith County, under a chancery court decree in the original sum of $2,962.70 against the appellant W. B. Adams

in favor of J. M. Griffin & Sons, Inc., rendered on January 24, 1950, and duly enrolled in the circuit clerk's office on February 17, 1950. On this enrolled judgment there was a balance due, according to the sheriff's notice of sale under execution, of the sum of $2,775.70, including $39.60 in court costs.

The principal issue presented for decision on this appeal is whether or not the residential property at Raleigh that was then being advertised by the sheriff for sale, constituted the homestead of the appellants so as to be exempt from sale under execution issued on the judgment hereinbefore mentioned.

The chancery court heard the case on bill and answer, on the motion to dissolve the temporary writ of injunction, on oral and documentary proof, and on the suggestion of damages filed by the appellee. The court dismissed the bill of complaint, dissolved the temporary writ of injunction, and allowed the appellee an attorney's fee of $250.00 which was stipulated by agreement to be reasonable in amount. The appellants appealed with supersedeas from that decree, but of course did not undertake to supersede the judgment in favor of J. M. Griffin & Sons, Inc., against W. B. Adams, on which the execution had been issued.

Mr. Adams testified that he is a resident citizen of this state, a householder and the head of a family, and that he and Mrs. Adams have four daughters; that he and his family moved to Jackson "somewhere around the latter part of 1951, I would say." But Mr. Raymond Wann testified that he moved into the residence at Raleigh, formerly occupied by Mr. and Mrs. Adams, and the children, and began occupying the residence and paying rent thereon to Mr. Adams as of February 12, 1951. Mr. Adams further testified on cross examination that he had owned 120 acres of land about a half mile from the town of Raleigh, in Smith County, which he sold to Eurel Thornton on April 19, 1951. This 120 acres of land was included in the sheriff's notice of sale under

the execution along with the two-acre lot and house in the town of Raleigh, since it belonged to the judgment debtor on February 17, 1951, when the decree of January 24, 1951, was enrolled. A separate suit was filed by Eurel Thornton against the sheriff to prevent the sale of this 120 acres that he had purchased from Mr. Adams, the question therein being whether or not this land was a part of the judgment debtor's alleged homestead in Smith County, on April 19, 1951, and with which we are not here concerned.

Mr. Adams also testified, in corroboration of the testimony of Mrs. Adams, that they moved to Jackson in order to educate their daughters, the oldest of whom entered Mississippi College shortly thereafter, and that this daughter and their second oldest daughter attended Belhaven College in Jackson during the next scholastic term; that these two daughters were attending summer school at Mississippi Southern College at Hattiesburg at the time of the trial of this case; that the oldest daughter would graduate at Belhaven College "about midterm" of the next session thereafter; that the second oldest daughter would attend Belhaven College during the next session following the trial of this case and would graduate at the end of the year; that the third daughter had been attending Central High School in Jackson and would graduate during the next year; and that the youngest daughter, ten years of age, attends the public schools in Jackson. Mrs. Adams had testified that she and Mr. Adams were unable to send their daughters to college without moving away from Raleigh, and that they had moved to Jackson temporarily for the purpose of educating them, and that she and her family intended to return to Raleigh and resume their residence there whenever this purpose had been accomplished. Mr. Adams testified likewise. It is to be observed that this would have required several more years if the education of the ten-year old daughter was to be completed before the return of the family to Raleigh.

The proof further shows that Mr. Adams has been engaged continuously for the past four years in the "oil leasing business," involving considerable travelling in Mississippi, Alabama, Texas, Louisiana and Florida, and that he is away from home "practically all the time"; and the record fails to disclose that he is now engaged in any kind of business at Raleigh, Mississippi, or that he has been so engaged there at any time since he moved to Jackson in 1951.

When Mr. Adams purchased the residential property in the Belvedere Subidivision of the City of Jackson on July 8, 1952, the title thereto was taken in his name and that of Mrs. Adams jointly. After having testified that they were paying rent to the Prudential Life Insurance Company on that property, he was asked: "Q. You did have a deed to that place? A. We had a supplemented deed. We didn't have a warranty deed. Well, we have a warranty deed, but there was a clause that Prudential Insurance put in it." It developed that what he meant was that when they bought the residence in the Belvedere Subdivision, there was a mortgage on the place in favor of the Prudential Life Insurance Company on which the purchasers were making monthly payments.

On March 31, 1954, Mr. Adams filed with the tax assessor of Hinds County an application under oath for homestead exemption on the property in the Belvedere Subdivision in Jackson, in which she stated, among other things, that she was the wife of W. B. Adams and that "This is the bona fide and only home of my family group, wherein we actually reside, and did on January 1, 1954." She was referring to Lot 13, Block B, of the Belvedere Subdivision in Jackson therein above described.

Then, on May 25, 1954, she and her husband, W. B. Adams, filed a homestead declaration in Smith County, duly sworn to, in which they declared that "We are entitled to homestead in said county and we have selected the same as follows:" (describing in detail the two-acre

lot in the town of Raleigh where they had lived prior to 1951).

 Mrs. Adams further testified that when she filed the application for homestead exemption in Hinds County, she filed it by *mistake*; that she was supposed to go to Raleigh and file the same. "Q. At the time you filed the application for homestead exemption in Hinds County, you were actually residing on the property described in that application, were you not? A. Yes, sir. Q. And that is where you live now, isn't it? A. We are renting from the Prudential Insurance Co. Q. That is where you are now? A. That is where we are. We have rented that for a year." It developed, however, in response to further questions by the attorney for the appellee that what she was undertaking to say was that the man from whom they bought the Jackson property had already secured a loan from the Prudential Life Insurance Company and had given it a note and deed of trust thereon payable in monthly installments. The trial court was warranted under all the testimony in finding that she evidently had no intention at the time she filed this homestead application in Hinds County to return to Smith County, or when she and her husband filed the homestead declaration there — in fact, she and the children were still residing in Jackson at the residence in the Belvedere Subdivision at the time of the trial of this cause and had continued to do so after the filing of the homestead declaration in Smith County, although the bill of complaint herein filed by Mrs. Adams and her husband, W. B. Adams, on June 4, 1954, alleges that "On the ...... day of June, 1954, complainants re-occupied their homestead by moving into the residence located on the above described lot or parcel of land and presently occupy and reside thereon as their homestead."

The proof discloses that as a matter of fact about the middle of May 1954 Mr. Adams, while all of the other members of the family were still residing in their residence located in the Belvedere Subdivision in the City of

Jackson, obtained the consent of his then tenant, Robert L. Stevens, to move some things into the back room of the house in the town of Raleigh, stating to the tenant at the time that J. M. Griffin & Sons had a judgment and were trying to sell his property and he wanted to move in that room and occupy it. Stevens testified that he raised some question with Mr. Adams about his family not liking to live with anyone else "since we had children," and that Mr. Adams said that his family was in Jackson and that the girls were in school, but that "he would want to stay there himself and that he would be in and out * * * that he was sure he would not bother me."

The proof fails to disclose whether Robert L. Stevens was renting the residence at Raleigh by the month or by the year. Neither does it disclose that the judgment debtor or any member of his family had arranged with this tenant to vacate the residence for their re-occupancy at any time prior to the date set for the sale under execution, or at any other time thereafter. Nor had either Mr. and Mrs. Adams ever expressed to this tenant or to any one else, at any time prior to the trial of this cause, their intention to move back to Raleigh in the not distant future, so far as the proof discloses.

It is to be conceded that the complainants in this suit have continued to register, pay their poll taxes and to vote in Smith County after their removal to Jackson in 1951. It seemed to be the theory of counsel for the appellee that they failed to change their voting place because it was more fun to vote in Smith County than in Jackson. But we wouldn't know about this, and would not be justified in taking judicial knowledge thereof. However, the circumstance as to where the complainants may have chosen to vote is not controlling on the issue here involved.

Section 328, Code of 1942, provides: "Whenever the debtor shall cease to reside on his homestead, it shall be liable to his debts, unless his removal be temporary,

by reason of some casualty or necessity, and with the purpose of speedily reoccupying it as soon as the cause of his absence can be removed."

Section 317, Code 1942, as amended by Chapter 360, Laws of 1950, provides, among other things, that: "Every citizen of this state, male or female, being a householder, and having a family, shall be entitled to hold exempt from seizure or sale, under execution or attachment, the lands or buildings owned and occupied as a residence by him or her, but the quantity of land shall not exceed one hundred and sixty (160) acres, nor the value thereof inclusive of improvements * * * the sum of five thousand dollar ($5,000.00); * * * . But husband or wife, widower or widow, over sixty (60) years of age, who has been an exemptionist under this section, shall not be deprived of such exemption because of not having family or of not occupying the homestead."

The proof discloses that the husband was 45 years of age at the time of the trial of this suit at the June 1954 term of the chancery court of Smith County, which term began on June 21, 1954, and the record is silent as to the age of the wife at that time.

The proof also discloses, without dispute, that the residential property in the town of Raleigh was worth approximately $6,000 at the time of the bringing of the instant suit and at the time of the trial thereof; and that the 120 acres of land was woodland at that time, and was within an enclosure of this and other lands then being used as a community pasture.

The fiat for the temporary injunction in the instant case to prevent only the sale of the residential property in the town of Raleigh was issued by the circuit judge, and the temporary injunction was made returnable before the chancery court, evidently on the theory that the complainants had reoccupied that property by moving into the residence, and that they were then presently

occupying and residing thereon as their homestead, as alleged in the bill of complaint.

The complainants make as an exhibit to their bill of complaint a warranty deed from W. B. Adams "to Mrs. W. B. Adams," which purports to have been executed by said grantor on August 5, 1949, and acknowledged on the same day, for a recited consideration of $10.00 and describing the two-acre residential lot in the town of Raleigh, but which was not marked filed for record or recorded until October 5, 1953, at 2:30 P. M. Mrs. Adams testified that she delivered this instrument to Mr. Friend B. Walker for record in 1949, he being the then chancery clerk of Smith County. Mr. Walker testified, however, that the deed was not lodged with him by the grantee in 1949, and that if it had been it would have been marked filed at the time of its delivery to him and would have been recorded in due course. And Miss Jerlene Arender, the deputy chancery clerk, who had been such only "since February 1951," testified that this deed was brought to her by Mr. Adams on October 5, 1953, and was thereupon marked filed and then recorded.

Miss Arender further testified that when the deed was handed to her by Mr. Adams she noticed that there had been an erasure of the year of the execution of the deed over the signature of Mr. Adams thereto and that "49" had been typed in the place where the year originally shown had been erased at the end of the words "Witness our signatures this the 5th day of August, 19......" Mr. Adams denied that there had been an erasure, and that the deed had been back-dated, and further testified that in October, 1953, after his wife had been unable to locate the deed at home, he went to the chancery clerk's office and that one of the deputies, whom he was unable to name, was able to locate the deed in the office and that it was then recorded. The effect of this testimony is that although the deed was claimed to have been lodged with the clerk in 1949 it had been kept in the office without being marked filed or recorded until October 5, 1953.

██ █ The chancellor in finding that the date on the deed from W. B. Adams to Mrs. W. B. Adams was changed and that the judgment creditor had no actual or constructive notice of said deed until the same are filed on October 5, 1953, had the right to reasonably infer that a chancery clerk would keep unrecorded deeds in some particular place in his office, pending their recordation, and that if this deed had remained lodged with him from sometime during the latter part of the year 1949 to October 5, 1953, he would have observed the same dozens of times during that period and would have noticed that it had neither been marked filed nor recorded.

██ █ Moreover, the original deed was shown by the testimony to have been in the complainants' witness room shortly before the complainants testified during the trial and that when Mr. Adams was asked to produce it he seemed to have erroneously thought that he had given it to the chancery clerk in order that he might check it with the record, but the chancery clerk testified that he merely had it long enough to make a memorandum of the book and page where it was recorded and then handed it back to this witness while in the witness room. The deed was never presented to the chancellor for inspection nor introduced in evidence and it was therefore not sent here on appeal as a part of the record. It is now attached as an exhibit to the reply brief of the appellants. Since the chancellor did not have an opportunity to inspect the original deed we make no comment in regard to the same for the reason that it is not properly a part of the record before us. ██ █ We think that the oral testimony of the chancery clerk and his deputy was sufficient to sustain the finding of the chancellor that the date as to the year of the execution of the deed had been changed; that the testimony of the notary public was of but little probative value; and that his finding in the decree that the "declaration of homestead and claim of homestead rights (by the complainants) to the land in Smith County (describing the house

and lot in question) has not been made in good faith and that the same does not constitute their home-stead; * * * ."

The fact remains that the chancellor found in his decree from the oral testimony, though conflicting, "that the dates on the deed from W. B. Adams to Mrs. W. B. Adams were changed and that the judgment creditors had no actual or constructive notice of said deed until the same was filed on October 5, 1953."

The above quoted finding of the chancellor was based on the conflicting testimony as to whether Mrs. Adams delivered the deed in 1949 to Friend B. Walker, the chancery clerk, or whether Mr. Adams delivered it to Miss Jerlene Arender, the deputy clerk, on October 5, 1953, the date on which she testified that she observed that there had been an erasure of whatever year it was first dated and the "49" substituted in lieu thereof.

Of course, if the property described in this deed had constituted the homestead on October 5, 1953, it would have been exempt from execution, and it would have been immaterial that the deed may have been executed in 1953, but the foregoing testimony on the issue of whether the deed had been back-dated is material on the question of the bona fides of the complainants when they filed their homestead declaration in Smith County on May 25, 1954, selecting the residential property at Raleigh as their alleged homestead, at a time when this property was being advertised for sale under execution, and when all the members of the family were still residing in their residence located in the Belvedere Subdivision in the City of Jackson, except that Mr. Adams had obtained consent of his then tenant, Robert L. Stevens, about the middle of May 1954 to move some things into the back room of the house, under the circumstances hereinbefore stated.

██ ██ It is strongly urged by the appellants that Section 320, Code of 1942, dealing with the effect of a homestead declaration, precludes a judgment creditor from contesting such a declaration except on the sole

ground that the judgment debtor "was not entitled to a homestead, * * * ." We do not think that there is any merit in the contention that the quoted words should be construed literally. All that is necessary to entitle a judgment creditor to sell a particular tract of land under execution is that the proof shall show that neither the judgment debtor nor his wife is entitled to claim the specific property as a homestead which is sought to be sold under the execution. If the argument of the appellants should be adopted a judgment debtor could purchase any number of lots and residences and prevent a sale of either of them under execution on the ground that he is entitled to *a* homestead.

The motion of complainants to consolidate this case with the case of Thornton v. Bounds, Sheriff, and with W. B. Adams v. J. M. Griffin & Sons (the latter being for a bill of review), was not seasonably made; and then too the chancellor stated into the record that the movants had refused a suggestion of consolidation in the early stage of the trial.

The appellants assign as error also that the court permitted the appellee to cross-examine Mr. Adams in regard to some facts involved in the other two cases. Some of this cross-examination was relevant on the question of the good faith of the homestead claim and to test the credibility of the witness. The ruling was reserved in regard to other parts of the cross-examination, and no ruling was later made. Consequently, there is no reviewable error as to that, and we find no reverisble error in the assignment as a whole.

We have carefully examined all of the cases cited by the appellants in their briefs, and we agree that the case of Trotter v. Dobbs, 38 Miss. 198; Campbell v. Adair, 45 Miss. 170; Dulion v. Harkness, 80 Miss. 8, 31, So. 416; Gilmore v. Brown, 93 Miss. 63, 46 So. 840; Levis-Zukoski Merc. Co. v. McIntyre, 93 Miss. 806, 47 So. 435, 666; Roberts v. Thomas, 94 Miss. 219, 48 So. 408; Barnes & Co. v. Buchanan, 108 Miss. 822, 67 So. 462; Jackson v. Cole-

man, 115 Miss. 535, 76 So. 545; Breland v. Parker, 150 Miss. 476, 116 So. 879; De Bardeleben Coal Corp. v. Parker, 164 Miss. 728, 144 So. 474; Holsomback v. Slaughter, 177 Miss. 553, 171 So. 541; Ritter v. Whitesides, 179 Miss. 706, 176 So. 728; Cliett v. First National Bank, 182 Miss. 560, 181 So. 713; and Bank of Cruger v. Hodge, 189 Miss. 356, 198 So. 26, together with a number of more recent cases not cited, support the rule that the homestead statutes hereinbefore referred to should be liberally construed in favor of the exemptionist, but it is also true that each of those cases were decided on the particular facts involved therein — materially different from the factual situation in this case. To analyze the factual situation in each of those cases would result in needlessly prolonging this already too lengthy opinion.

We do not think that the cases of Hinds v. Morgan, 75 Miss. 509, 23 So. 35; Collins v. Bounds, 82 Miss. 447, 34 So. 355; McDonald v. Sanford, 88 Miss. 633, 41 So. 369; Wood v. Bowles, 92 Miss. 843, 46 So. 414; Young v. Ashley, 123 Miss. 693, 86 So. 458; Pan American Petroleum Corp. v. Gully, State Tax Collector, 179 Miss. 847, 175 So. 185; and Daily v. City of Gulfport, 212 Miss. 361, 54 So. 2d 485, cited by the appellants have any application to the material facts of the instant case.

In the case of Bank of Cruger v. Hodge, supra, the Court said: "The statute allows only a removal which may be justly adjudged as temporary and requires a speedy return as soon as the cause of the absence can be removed; but according to the testimony, the obstacle in the way of a speedy return may never be removed. The case is controlled, therefore, by the rule as reviewed in Bank of Hattiesburg v. Mollere, 118 Miss. 154, 79 So. 87, with the result that it must be held that there is an abandonment of the homestead." Then the Court further said: "Appellee relies on her second contention on the long line of cases in this state beginning with Trotter v. Dobbs, 38 Miss. 198, to the effect that a judgment debtor may successfully interpose his claim of exemption as

against the execution creditor at any time before sale under the execution if the debtor has actually gone into the occupancy or re-occupancy of the land as a homestead at the time of the sale. In order to avail of that rule, the premises being already habitable, the occupancy must be such as will stamp the place claimed as a homestead with the character then and there of an actual and permanent residence of the debtor and his family, and it is not sufficient that it has been made a mere part-time lodging place, while the real residence of the family remains elsewhere, as the testimony shows was the case here."

We are of the opinion that what was said in the case above quoted from announces the principles to be applied in the instant case. Applying those principles to the facts of the case before us, the decree appealed from should be affirmed.

Affirmed.

*Hall, Kyle, Holmes* and *Gillespie, JJ.*, concur.